With the attorneys that are going to argue, please step up to the podium and identify yourselves for the record. Good morning, your honors. My name is John Ratnaswamy, and I'm the attorney representing Commonwealth Edison Company today. Tom Stanton, Special Assistant Attorney General, and I'm representing the Illinois Commerce Commission. Okay, good morning to both of you. Before we proceed, what is that over there, may I ask? This is a blow-up for the pages of my brief. And were you planning on using that or something? To be honest, I'm thinking about it. I see, okay. Sure, I just wanted to know beforehand. So we're going to give each side approximately 15 minutes to present argument, and from that, Mr. Ratnaswamy, you may have some time for rebuttal. I do want to advise the parties that Justice Cobbs will be the third panel member on this case. She's unable to be here today, but she will listen to the oral arguments, obviously read all the briefs and the documents necessary, and will participate in our decision. So, with that, Mr. Ratnaswamy, you may proceed. Thank you, Your Honor. I'd like to reserve six minutes of the 15 for rebuttal, please. Certainly. Good morning. May it please the Court, again, my name is John Ratnaswamy and I represent ComEd in this appeal. By way of context, we're near the end of the fourth year of ComEd's rates for distributing electricity being calculated and issued under what's called a formula rate. The formula rate was authorized by the legislature in 2011, and the law required the Commission to establish ComEd's rates in 2012, which the Commission did. I want to just ask you one question. This earlier ComEd commerce case where Justice Neville was the author, was there a determination in that case at all regarding the formula rate at all? Not the issue that's before you, if that's what you're asking. Yes, it wasn't. But they determined in that particular case whether the rate was appropriate? Would that be a fair question? Yes, so rate cases, possibly sadly from the perspective of the Court, often generate appeals because there's so many issues and there's a lot of money involved. Yes. And so the rate case appeals involve things like recovery of certain capital costs or recovery of pension assets. Sure, but this one is about whether or not your definition of what this rate formula structure should be versus the Commerce Commission. Right. And both sides agree, the law unambiguously says that if the Commission's going to change the structure, it needs to do that in a proceeding under Article 9 of the Public Utilities Act. It can't do that in these annual updates where essentially numbers are involved. There's a new year of data, you put number in the formula, you do some calculations, the rate comes out. Well, if this is the fourth year you've been doing this. Right. What was the formula that was used for the three preceding annual updates? Well, from my perspective, and I think from things the Commission has said at times, it's the formula they approved in 2012. If they hadn't approved the formula in 2012, which the brief almost makes it sound like sometimes, I don't know how we calculated charges for the last four years, but of course the answer is the formula was approved in 2012. But under the statute, the Commission had to approve it. Yes. That's what it actually says. Yes. Does it use the word shall? Yes. All right. And the single issue here, yes, it involves statutory language, but it's the language as applied to ComEd. And that's very important from our perspective. It is what the Commission's own order says on page 1, and it says it again on page 16 three times that this is about how the language applies to ComEd. Because the ICC's brief tries to make this sound like it's a general question about what the statute means. And that is not what the Commission's own order says. The legislation itself arises out of a regulatory compact. The state wanted the grid modernized, and so it adopted a legislative package, and the utilities get to choose whether to opt in. ComEd chose to opt in, agreed to spend $2.6 billion more than it otherwise would spend, agreed to a lower rate of return than under traditional rate making, agreed to performance requirements, which if it doesn't meet, ComEd will have some trouble. And in return, what it got was this formula rate mechanism. In fact, even the ICC's brief on page 3 says the rate mechanism was part of the incentive for the utilities to opt in to the statute. And the General Assembly has said in explaining the objectives of the formula rate, and now I'm quoting from two resolutions that are identical, one by the Illinois House and one by the Illinois Senate, and a later statute made those resolutions binding. Participating utilities that elect to undertake the infrastructure investment plan may recover their costs through a performance-based formula rate tariff mechanism, which was designed to increase predictability, stability, and transparency in the rate making process. Under the, and specifically added this language which said the structure of the formula can't be changed in these annual updates once the formula is set. It has to be done in a separate Article 9 proceeding. But you're saying that the Commerce Commission formally set this three years ago? Yes. In May 29, 2012, the formula was approved. There was a rehearing, and they changed that in May. I don't have a copy of the something like 300-page order from the 2011 case. But it wasn't really all 300 pages where they said what you said. No. All commissioners in big cases at least have finding and ordering paragraphs at the end. Yes. And in that order, and I want to say, I think I might have the page number. You do reference it in your brief, don't you? Yeah. I think it's page 175 if I remember right. But it says we've established the formula, and you have to do a compliance filing, which is this full spreadsheet that conforms to the rules we've made, which the record shows we did. We filed the whole formula. All right. You say the statute is clear and unambiguous. Yes, Your Honor. What is the clear and unambiguous language you're referring to that establishes your formula? So when it says formula rate structure, we believe that means the substance of the formula. What's in the formula that tells us how to calculate comments rate. So it's the substance of it. Okay. And so you've come up with the, what are the first two FR, what are they? So the commission ordered just, so the formula is just a spreadsheet. Yeah. And the commission ordered that these two tasks of that spreadsheet and only these two have to go in comments tariff. Right. And the commission on appeal is saying that what the legislature cared about, I'm putting words in their mouth but it's fair, is the order in which things are grouped and appeared but not the substance. So to give an example. But I, all right. Yeah, go ahead. Give an example. So this line here, distribution expense, in the most recent rate case involved $460 million. And what the commission is saying is that when the commission, when the general assembly said you can't change the structure without going to an article nine case, that if the commission changed the formula for calculating distribution expense that appears on schedule C, so that 460 million became 560 million or 360 million, they can do that in the update and the general assembly doesn't care about that. But if you flip lines one and two and you put customer expense first and distribution expense second, the general assembly somehow cared about that, even though it doesn't have the slightest effect on a single human being on the face of the earth. Well, you've suggested then that in addition to those, that what also should be included are the appendices and what was the other thing? They're called schedules and appendices. Schedules. Are those the schedules? Those are the two executive summaries. Right, the summaries. And then your own schedules and appendices. Well, where do you draw the line? Because you don't include your work papers, right? We don't include the work papers, that's true. How did you come up with staffing where you've staffed? Where is the limit? Is it in the plain and unambiguous language? The work papers do not change the formula. But the appendices do. But the schedules and appendices have the formula. The work papers are about things like the data that goes into the schedules and appendices. But they don't change anything. No. I mean, I suppose if you changed the work paper and said we'll use this data instead of that data, it would change the data. But the formula is in the schedule and the appendices. And although the commission says in its brief it's never approved them, it has to. Otherwise, how did we charge rates for the last four years? But also, there's multiple dockets. And the commission has ruled on things in the other schedules. In docket 130399, they ruled on four of the other schedules and four of the appendices, about what would go on them. And in that case, the commission attached the entire spreadsheet to its order. So to say that the commission has never approved the full spreadsheet, I don't think is a possible position for the ICC to take. Well, why don't you explain to me what's the – there's obviously money at stake here, right? Isn't that what we're really – isn't that why you want certain things in and the commission ruled that they would not be part of it? I'm going to say no, Your Honor, because this is not an appeal for a rate case. If you rule for ComEd, ComEd's customers do not pay one cent more, one cent less, much less a dollar or millions of dollars. Now that the formula – sometimes when it's talked about in the press, it's like it's an automatic rate increase. Two of the five years, it's been a big rate decrease. The current rates that people pay, if you happen to be a ComEd customer, were decreased by tens of millions of dollars by the formula. So the formula isn't an automatic increase. It's a formula. Okay. Well, there has to be something that you're actually – both of you are – Yes. So why do we care? So we do these annual updates proceedings where there's new data and also they look backward at the past year and say, did you recover too much, too little? And they square it up. So the customers pay exactly what they should. In those cases, interveners, and sometimes the staff, try to change the formula from time to time. And they try to do it in the update cases, which means you're litigating the formula. At the same time, you're litigating the data that goes in the formula, which is a mess. And it goes against the statutory goals of predictability, stability. If you only change the formula in the separate Article 9 cases, then you can track what's going on. One of the points made by our witnesses is, if you change the formula in these update cases, then you have to read these 100, 200-page orders to figure out, why did the formula change? What was the reason for that? If you handle that in a separate Article 9 case, it's clean. Let's talk about the standard of review. You're suggesting that somehow this is just de novo review. We're looking at a statute, and we don't really – you reference the Philip Morris case. It's not an administrative review case. And you cite that for this suggestion that this is a de novo review. How can you cite that case when we're talking about administrative review? I believe, including in our reply brief on pages 4 to 5, that we cited cases involving administrators. Well, why don't you direct me to the actual statutory standard of review? Because the statute actually directs us to our standard of review, doesn't it? Prima facie, the facts are considered prima facie correct. And actually the order, the reasoning of the order, is also considered reasonable. Is it not? It is, but we also cited case laws, certainly in our opening brief. Who has the burden here? I have the burden as the appellant. All right. That is 100 percent clear. What is your burden in addition to having the burden? Is it substantial evidence? No. How would you paraphrase it? No, because the case that we cited says that this is de novo when the facts are undisputed. Okay. And I don't know of any disputed facts in this case. Well, how can you say there are no disputed facts when you called your witness and she testified? Brinkley? Was that Ms. Brinkley? Brinkley, yes. Brinkley. Then the staff called a witness, another woman. What was her name? Ms. Ebrie. Ebrie? Ebrie. E-b-r-e-y. Right. And they actually had differing testimony, did they not? They did, but please keep in mind they were testifying about the particular issue in the formula to change, the depreciation expense issue, as well as this issue. And from our point of view, Ms. Ebrie did not testify to anything that contradicted the facts stated by Ms. Brinkley. So she, you're saying she essentially agreed with Ms. Brinkley. No, I can't say that she agreed. What I can say is she said her opinion was different from Ms. Brinkley, but she didn't actually point to any facts that were different than the facts stated by Ms. Brinkley. Well, that's how you're reading her testimony. That is how I read it. All right. Now, do we read it how you read it, or do we give some deference to the conclusions and the reasoning that the Commerce Commission chose? If you thought there were disputed issues of fact, then you'd have to go beyond the de novo standard, and you'd have to look at whether it's supported by substantial evidence, whether it's contrary to the manifest way of evidence, whether it's arbitrary, which is unreasonable. Give me a case that you think supports this idea that we're reviewing this case de novo. All right. We're certainly not bound by the order, but in terms of giving deference, I think the statute itself suggests that we do if they're interpreting their own statutes. I respectfully disagree, Your Honor. So if you look at, for example, pages 27 and 28 of our brief, the last case on 27, and the two at the end of the paragraph are cases involving the Online Commerce Commission, and, for example, the Illinois Independent Telephone case and the Citizens Utilities case both say if the issues of law and the facts are not in dispute, then the ICC's findings are not binding and they're not presumed to be correct. Okay. Now, let's look at a previous decision. Okay. And I'll just, it's this earlier ComEd case, but it actually talks about the statute. Yes. And under that statute, 10-201E-4 of the Act, this Court, meaning the appellate court, should not disturb the Commission's rulings unless the rulings are not supported by substantial evidence based on the record. So your position would be there's substantial evidence supporting your... Yes, and there's not substantial evidence for that. And the Commission acted outside the scope of its statutory authority. That's one of the grounds. The Commission issued findings in violation of the state or federal constitution or law, or the proceedings or the manner in which the Commission reached its findings violate the state or federal constitution or laws. Is that an accurate statement? That is an accurate statement of what E-5-1-4, I think, says. And as you pointed out, we're not bound by the Commission's interpretation, but the interpretation, and here's the language, of a statute by the agency charged with the administration of the statute is entitled to substantial deference, and such construction should be and is normally persuasive. Is that an accurate statement or not? I don't see how that can be squared with a number of decisions from the Illinois appellate court which say that when the facts aren't in dispute, they do not get deference on the statute. Well, we're talking about a Commonwealth Edison Illinois Commerce Commission case, and the statute here actually describes the standard of review. There's a statutory guideline. So to take some other type of administrative review case and say that this is in conflict with that, how do you reach that conclusion? If you're using the term administrative review in a technical sense, they are not administrative review cases. Final decisions of the Commission are appealed directly to this court under the Public Utilities Act itself. Exactly. And doesn't the Public Utilities Act say what I just said it says? Oh, absolutely. All right. Okay. All right. We're past de novo review. We're past that issue. Okay? Okay. Now, you also say that the statute is clear and unambiguous. Give us some support for how you want us to construe the statute the way you believe it should be construed. Sure. So it's got this term formula rate structure. Yes. And it doesn't define it, but it uses it in context. Just like it uses the word protocols in context, and it also says the protocols can only be changed in Article 9, and everyone actually has agreed what that means. So it's not like you have to have a formal definition. We believe it means the substance of the statute, of the formula, excuse me. And there's multiple reasons for thinking it means the substance. One of them is it makes the law achieve its objectives. The formula then is stable. It's predictable. It's certain. It's specific. If it's only the order of the items on here or how they're grouped, which doesn't change the rates at all, there isn't any reason the General Assembly would have cared about that. In fact, to this day, the briefs and evidence from the ICC have never explained why anyone would care about that. It only makes sense to care about the substance of the formula. In the ICC's brief on page 31, they say two things. Well, it's more than two things. But two of the things they say are fundamental changes to the formula should be made in Article 9 cases. If that sentence ended there, I'd be clapping. But then the brief goes on to say, and what's fundamental is the appearance of these things, which doesn't make any sense to us. You're saying what's fundamental is the substance and the figures or numbers that back it up. Right. And also when Ms. Brigham testified, and yes, it is true we had testimony, she talked about material changes. And we also have a history here of even to this day, every time the formula itself has been changed, the Commission did that in an Article 9 proceeding. They've just decided going forward that they don't have to do that anymore. They only have to go to Article 9 if they're going to change the order of this, which we don't care about, really. Let's see. I have no idea where I am on time. I'm sorry. Well, you can keep going. Okay. You have more to say. Okay. We've given, so I'll try to say just a couple things I didn't say in the brief. One is another analogy. The briefing already has analogies. But basically, let's suppose the formula is A plus B plus C. Okay. It's that simple. The Commission is saying that what the General Assembly cared about was that it was A plus B plus C and that they wanted a special proceeding if you changed it to A plus C plus B, which is exactly the same thing. But they're saying in these updates, we can change what A means and what B means and what C means, and the General Assembly didn't care about that. They don't want the special procedure for that. Again, I don't think that makes sense. Okay. Coming back to something that's been at the beginning, I want to stress again that both in the Ameren case, where they dealt with an issue like this, and in the order below, they said the issue was how the statute applies to convent's formula. So it was not the issue. In the Ameren case, I thought they said that specifically they left open this possibility that what we're saying here does not necessarily apply to convent. Didn't they say that? Yes. In the Ameren case, they said more than that. They also said that they were deciding the issue as it applied to Ameren. Just like here, they said they're deciding the issue as to convent, and they said they would decide the issue based on the record as to convent. This whole thing about there's something possibly inefficient or whatever wrong with Article 9 cases doesn't make sense conceptually or based on actual history. The update cases take eight months. They can only be started around April or so, and they have to be decided by December. An Article 9 case can be started any day of the year. It can last any amount of time that the commission wants it to. And in this very case, when the commission was changing the depreciation expense formula, start to finish it was three months and six days. The hypothetical in the order, which says there's some problem with going to Article 9, assumes that the case gets started late for no reason, and then it takes two years, which none of these cases have ever taken. All the formula cases have been decided, I mean, they've been really quick. Even when we had this big debate about the depreciation expense, it took three months. So it's really fanciful to suggest there's something wrong with doing what we think the legislature ordered, which is going to change the formula, do it in the Article 9 case. Unless you guys have any other questions, I'll sit down. Well, you're saying that the formula that you've used for the last three previous rate, annual rate, what do they call it, annual rate? Updates. Updates has been this formula that you're suggesting is the schedules plus your appendices, and what else was there? Was there something else? The full set of schedules, so not just these two, and the appendices, right. And you're saying that's how the three previous rate updates were conducted? Yes, the only difference is we've had a couple changes to the formula that were handled in Article 9 cases the way they're supposed to be, and so the formula has been slightly changed. But it's basically the same formula that was adopted in 2012 with those slight changes. Anything further you want to add at this time? Not at this time, Your Honor, thank you. All right. Mr. Stanton? Yes, thank you, Your Honor. I think the simplest way to think about this case is that the formula rate is not the same thing as the formula rate structure. The formula rate structure, it's ambiguous. It's what? It's ambiguous. The term formula rate structure is not defined in the statute. What did you argue in front of the Commerce Commission? Because they determined the statute was ambiguous. That was what they included in their order, didn't they? Well, they didn't say the magic words, ambiguous, but the Commission looked to the statute, looked at the term formula rate structure. It's not defined in the statute, so then the Commission considered competing positions or competing definitions of the term from ComEd and from the staff of the Commission. ComEd's position was that the formula rate structure included not only the Schedule FRA-1 and the FRA-1 REC, but the Commission had already approved in that 110721 order that you alluded to. We had first done that back in 2012, and we established the formula rate back there, and we determined that the schedules that were going to be in the tariff, these Schedules FRA-1 and FRA-1 REC, that those were the schedules to be included in the tariff. All of their supporting documents, supporting materials, the appendices, the work papers, all that stuff was not to be included in the tariff. The Commission ruled that those were informational sheets. And in later order, in the 120321 order... So are you saying that when counsel suggested that they used this formula in the three previous rate structure reviews or updates, that the formula rate structure you're referring to was different than what they're suggesting? Well, the issue didn't come up. The issue wasn't specifically decided. The Commission said it had indecisively ruled on the issue. But the Commission determined the formula rate in the first proceeding, and then there were annual updates to each proceeding because it may be helpful... The statute requires that, doesn't it? Right. It may be helpful to talk about kind of what is this schedule, right? They call it an executive summary. They call it a summary schedule. But that just masks what it actually is. This is the traditional rate-making formula that the Commission has used for nearly a century, that other state commissions use to do rate of return regulation. And on page 17 of the brief there, the regulatory formula, the rate-making formula, is simply revenue requirement equals the operating expenses plus the product of the rate base times the authorized return. And essentially it's the revenue requirement equals the operating expenses plus a fair profit. And that's what you see on the schedule FRA1. You see categories of expenses. And, again, they're categories because the Commission determined that it's a structure. So it's the major elements, right? The terms, you know, structure and the terms of rate structure. What do those words mean? They mean the framework or arrangement, right, of elements that reflects the general character of the whole. It's not every single calculation in their supporting paper. So in, say, for example, lines 1 through 10, these are different operating expenses. There's your operating expense. There's a rate base on line 12. The authorized return is on line 14. And then you have the revenue requirement. So that equals the revenue requirement. And what the formula rate does is it adds two features. It adds this reconciliation balance because under the formula rate, and Council talked a little bit about this, in exchange for a guarantee that they recover their actual cost each year and their authorized rate of return, that was the exchange of the bargain. They committed to $2.6 billion in investment in the network and a certain amount of jobs. But that's the change from the general rate-making formula. It's not a drastic departure from the past. I think they want to make that point. But it really builds upon the traditional rate-making formula. And then each year, because they're guaranteed their costs, each year we set the initial formula, and then each year we set a, call it an initial revenue requirement or kind of a proxy revenue requirement because we don't know what their costs are. Say we're going to do it for 2014. Well, can I ask you one question? Sure. When you say they're guaranteed their costs, are those the costs for the updating or the improving of the grid, or are these all of their costs for everything else in terms of producing the electricity, delivering it? I mean, I'm not certain when you say costs. Sure. They're guaranteed their costs. They're guaranteed. They're prudent and reasonable costs. They're a delivery service, so they deliver the commodity. They don't charge for the commodity. It's done by the Illinois Power Agency. But, yes, they're out there. All the distribution costs, you see, and here's the categories, distribution expenses, customer expenses. So each year they incur costs. And when I talk about the guarantee that they're eligible to recover their actual costs, we do a reconciliation. So we set, say 2014, we're going to set the rates. We use their costs from 2013, and they file these in a Form 1, and it's certified by their officers. It's filed with the Federal Energy Regulatory Commission. And each year we take those numbers. We set a revenue requirement. And at the end of the year, once those actual costs are known, they're not known to say, well, somebody's doing it in 2013. We know the costs in 2014. We reconcile. So we set a proxy revenue requirement. And then whatever their actual costs are, they'll be determined. And the difference is if they over-recovered their costs, that will be a credit back to consumers. If they under-recovered their costs, well, then in the next year they will be able to recover that balance. And so this reconciliation is, that's what happens each year. So there's an annual reconciliation because, again, under the statute, the performance-based formula rate, they're entitled to recover their actual costs. That was the bargain. They would invest $2.6 billion over 10 years in the network, and they would get the certainty, and other things too, and they would get the certainty of recovering their costs each year and their rate of return, more importantly, and their rate of return within a window, and that's in the ROE collar adjustment on line 35. So essentially we do this each year. We set their costs for 2013. We determine what they were, their actual costs, 2014, 2015. So the formula is set, but in each year there's updates to the cost. So that's what these annual – that's what these annual – an FRA rec should be the only documentation included in the original tariff. Is that an accurate statement? And you're saying that – or that's the Commerce Commission's position. But ComEd argues that the actual substance that's behind these schedules is – should be determinative. Schedules – the supporting schedules, appendices, and work papers are source information, ultimately for the categories of expenses on this schedule, FRA-1 and FRA-1 rec. They're source information. Why the rate structure – the formula rate structure term is important because it essentially determines which changes to the formula rate can be made at annual rate proceedings or in a separate Section 9201 proceeding. That's the importance of the definition of rate structure because if you have a broader construction of rate structure, all of their schedules, appendices, and work papers, then to the extent that there are routine adjustments that need to be made in the annual rate update case, under their position, no. If there's a dispute arises, then it's a separate proceeding, separate 921 proceeding. We couldn't do that in this annual rate update, and there's tight deadlines. We have to get that done in eight months. The earlier of eight months are December 31st. And so to the extent that – so ComEd files each year, May 1st. It files their new cost, all these forms and all the backup, and the commission must determine the new rates, the reconciliation that I was talking about, by the end of the year. So it's important to determine the rate structure because it will take issues out that should be decided, routine, regular issues, interpretive issues, application issues. There's a good example in this case is ComEd in the depreciation expense. ComEd updated its cost depreciation study and then only applied it to the plant additions. It didn't apply it to the embedded rate base. And so there was a dispute between the staff and between ComEd, and under ComEd's position that all of their schedules, appendices have to be in this one document. The determination of that adjustment or that resolve of that dispute would have to be in a separate proceeding. And so why it's important, like I said, is the rate structure because the commission – review rates or change the rate structure or protocols in the annual update proceeding. Why did this come up then in the fourth annual update and not in the first, the second, or the third? I think this is the issue where it came to a head. I think it may have been bubbling under, but this is the issue where it came to the head with this depreciation expense. Under the statute, wasn't the Commerce Commission supposed to make this determination before? Isn't the statute directing the Commerce Commission to come up with this rate structure formula? Maybe I'm interchanging the words. Well, I think that's the key, Your Honor. Well, why didn't they do that in the first one? Well, the staff would argue that in effect we did. When we set the schedule in the first, back in 2012, in the 110721 order that this Court, in Justice Neville's decision, affirmed the commission, we set the formula rate. And the issue of whether the rates, the precise issue of the rate structure didn't really come up, but we set the formula rate. Why not? Why didn't it come up? Why wasn't it determined in the first rate structure review? Right. As I said, in effect, we think the commission did, but the commission said it didn't decisively rule. In effect, it did because it established this particular schedule, this FR-A1 and FR-A1-REC, and the different categories. Did they produce all these other documents in the three previous updates? Well, in the first proceeding, the 110721 proceeding, they did. They filed not only the Schedule FR-A1 and FR-A1-REC, they filed all the supporting schedules, appendices, and work papers. What the commission did was said, no, the only schedule that's going to go into the tariff is the Schedule FR-A1 and FR-A1-REC. Did they say that in the first? Absolutely. What we told them was, you have to remove all those supporting schedules, appendices, and work papers. They are not to be part of the tariff. They are informational sheets. All right. So in the second and the third, what did they do? In the second one, again, they took them out of the tariff, but we said, you can file those with us. I mean, they provide the backup for the calculations. That's the source material for some of the expense categories here and the categories here. And they're entitled to file that so the interveners and the staff can look at it and see, kind of like show us your math, right? These numbers are the ones that ultimately matter. Wouldn't the math be important? Wouldn't the math be important? Call it substance, call it math. Wouldn't that be important? Well, it's important to see how they got these numbers, but it's not important that that information be in the tariff itself. Okay, but how is an informed decision made if there isn't any substance or backup or math to support what they're doing in their update? Absolutely. They file that each year. So they file not only the Schedule FRA1 and FRA1-REC, they file all their supporting materials in their initial filing. What we told them in the 110721 order was just, you can't include all those supporting schedules and materials in the tariff itself. Sure, you can. You can or you cannot? You cannot. The only thing that goes in the tariff is the Schedule FRA1 and FRA1-REC. What we said in the next order, in the first reconciliation and update order, that's the 120321, we said that those are guidelines, that your schedules, appendices, work papers that you file with us, these are guidelines. They provide guidance in the development of the inputs that go into this Schedule FRA1 and FRA1-REC. So, yes, I think it's important that they file this information with us so interveners and our staff can review it, make sure that the calculations are correct, that they've made the appropriate adjustments, taking the cost from the FERC Form 1 and adjusting it for Illinois law. Commission rulings is not all of the expenses that they incur that are in the FERC Form 1 are eligible for recovery in Illinois. So, for example, lobbying expenses is generally not a recoverable expense, certain advertising expenses. So it's not a matter of they just take certain costs out of the FERC 1, plug them into their appendices and schedules and work papers, and boom, end of the day we get a number. That's not how it works. They have to be adjusted. They have to be Illinois specific. So, sure, it's important that they provide that information to us, but what we said was that's not material that's in the tariff. And in this case, we said that's not the rate structure. The rate structure is, as I've talked about, is Schedule FRA 1. These are the major categories, and it's consistent with the ordinary term structure, and the legislature used rate structure for a reason. Everywhere else, formula rate, but then it said in particular cases, rate structure. And it's important in the, like as I mentioned, for where are these disputes going to be resolved. So the formula rate structure is important for that. It's an ambiguous term. I can't think of another ambiguous term. Cost and rate are the most protean terms that have a, you know, could be read a number of different ways depending on the context. So that argument regarding the plain language, you know, is simply without merit. It's clear that this statute, that this term is ambiguous, and the statute tells the commission, and I think you mentioned it in the very beginning, Justice Frey, that the statute gives the authority to the commission to approve the formula rate and the commission to approve which cost components go in and which are specified with sufficient specificity. So that decision is from the commission. They make the initial filing with their formula rate in the first case in that 110721, but ultimately that's the commission's decision to approve it as modified, and it's ultimately the commission's decision to make those determinations with respect to what cost components go into the tariff. Anything further that you wish to add at this time? I think that's it. Thank you, Your Honor. All right. Thank you, Mr. Stegman. Mr. Araswamy, some rebuttal? Yes, Your Honor. I will try to say all new things. First, the order below, just like the Ammon order, did not find the statute ambiguous. I don't think you can say that's just magic words. They did not find that. They did not reason that. Second, you asked why is this in the tariff and the rest isn't. We know the answer to that one. If you go back to look at, and this is in our briefs, the 2012 order in which this formula was approved, the commission said it had nothing to do with what was the structure of that. The commission said this is what they thought customers would want to see and that customers wouldn't want to see the whole spreadsheet. I personally don't agree with that decision. I think the notion that a customer wants to look at this is not reasonable. But in any event, that was the commission's reason, and that's crystal clear in their order. It had nothing to do with what is the formula, what is the structure. They just wanted this amount to be in the tariff because they thought customers might look at the tariff. Third, one of the things Mr. Stanton said early on is the whole problem. He's saying these pages, in essence, are the revenue requirement formula that you've seen in every commission rate case. That's the time in Memorial. You've seen it in every appeal about a rate case. The revenue requirement is operating expense plus rate base times rate of return. Then why did the legislature pass something they called regulatory reform? Because section 16108.5, part of its name is regulatory reform. We didn't have a formula rate before. This was a whole change in how things were being done to set rates, and it is the problem, not the solution, to say all we're going to put in the tariff is something that's the same as what the law has been forever. It doesn't do anyone any good. Fourth, just as a historical fact, calling this the summary isn't something new. If you look at cross-exhibit 1, it's not in the appendix. It's in the common law record. It points out that in our testimony in the 2011 case, we called this the summary. It's nothing new to call it the summary. Fifth, the other stuff isn't just source information. I'm sorry, I don't have a blowup of this. But in the appendix at page 32, it shows you the first page of Schedule C-1. I'll pause if you want to look at it. So the summary says, go get your distribution expense number from line 11 of Schedule C-1. If you look at C-1, you see there's a bunch of formulas that decide what goes on line 11. It tells you in line 1 on Schedule C-1, get this data from the Form 1 that Mr. Stanton talked about. Then it says in line 2, make a bunch of adjustments, like remove costs we disallowed in past orders. Then lines 3, 4, 5, and 6, and 7, sorry, 3, 4, 5, and 6, involve splitting off part of the expense because it's recovered through rates that are approved by FERC, not by the Federal Commission, not the ICC. Then you have to deal with taxes, and again, you're splitting between the two sets of rates, and eventually you get to line 11. None of that is in here. Those are things that involve millions or tens of millions of dollars. They're important. They're important to ComEd. They're important to its customers. And the ICC is saying the General Assembly, again, didn't care about that. They cared if you moved the lines up or down, but they didn't care what the lines meant, what the numbers are, how it affects ComEd, how it affects its customers. Sixth, the depreciation expense issue proves our problem. This is in Ms. Brinkman's direct testimony, and it's not contradicted. The Commission staff took a position on this exact depreciation expense issue in the case that established the tariff in 2012. Three cases later, the Commission staff decided they wanted to change their position. This is not an issue that just came up or emerged. They testified about it in the first case, and the Commission made a decision. That shows the problem of changes to the formula being made in the updates as opposed to separately like they're supposed to be. Seven, we do file the whole spreadsheet in every one of these cases. It is true that in one of the five cases so far, the 12-0321 case, they called it guidelines. But in the 11 case, the establishment, they called it a fine being done in compliance. And I think in the 13 case and the 14 case, again, they said it was part of our compliance with the Commission's rulings. And when we had the separate Article 9 cases, we filed the whole thing. And in the docket 130399, the Commission itself attached the whole thing, all the schedules and all the appendices to their order, not just the summary. Let's see, the Form 1, I already made my point. Mr. Stanton's right that we added the reconciliation. We certainly don't have guaranteed cost recovery because prudence is reviewed. Nothing has changed about that. And the Commission disallows cost in every case. And finally, again, this isn't again, but Mr. Stanton hasn't pointed you to any question of fact that takes this out of, in our view, the de novo standard of review. I don't know what the question of fact is that's disputed. Well, under traditional administrative review, if we're applying a statute to a given set of facts, it's never been de novo. It's clearly erroneous. That's the law. Now, you tell me differently. If you're applying a statute to a given set of facts, so we'll say you've got the given set of facts. There's no changes, nothing, no discrepancies, no disputes. When you're applying a statute to a given set of facts, the standard in administrative review is clearly erroneous. It's not de novo. Maybe I'm mistaken. That's my understanding of it. It would be a clearly erroneous standard of review, not de novo. And under the clearly erroneous standard, there is some deference, but it's not the same as de novo where we're giving no deference. But in any event, we're not bound by their ruling under any of the case laws. So in that sense, you know, it doesn't matter whether we disagree on the de novo standard. If the appellate court isn't actually bound by the decision, which we're not, you see what I'm saying? Yes. But the standard of review, it's my way of thinking, when you're applying a given set of facts to a particular statute, the standard of review has always been clearly erroneous. But I think we're governed by standards that are actually in the Act itself. Right. So the three cases, I hesitate to go off on a tangent for a second, but I will. So 10-201E5-1-4 has a list. But the appellate court clearly, and no one disagrees with this, I believe, has, to say expanded on the list I don't think is right, has made clear that other things fall on that list. For example, arbitrary and capricious decisions of the ICC are reversed, even though arbitrary and capricious don't appear in 10-201. If, I don't, let me put it this way. I don't think that the de novo versus clearly erroneous matters from my perspective, because there is not in my mind any sensible standard in which the ICC's decision meets the law. It is clearly erroneous. And the cases we cite that involve the ICC, I think it's right that they don't use the word de novo, but they say no deference. So I don't know that I can square all the case law, but those ones involve the Commerce Commission. All right. Anything further or final comments? Thank you, Your Honor. Yes, please do. Thank you.  Thank you, counsel.